UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

| | |
|---|---|
| OLYMPIC PARK ASSOCIATES, WILDERNESS WATCH, and PUBLIC EMPLOYEES FOR ENVIRONMENTAL RESPONSIBILITY,<br><br>Plaintiffs,<br><br>v.<br><br>FRAN P. MAINELLA, in her official capacity as Director of the National Park Service, an agency of the United States Department of the Interior; JONATHAN B. JARVIS, NPS Regional Director for the Pacific West Region; and WILLIAM G. LAITNER, Superintendent of Olympic National Park,<br><br>Defendants. | Case No. C04-5732FDB<br><br>ORDER GRANTING PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT and DENYING DEFENDANTS' CROSS-MOTION FOR SUMMARY JUDGMENT |

Plaintiffs Olympic Park Associates and Wilderness Watch, joined by Plaintiff Public Employees for Environmental Responsibility, move for summary judgment on their claims that the National Park Service (NPS) has violated the Wilderness Act and the National Environmental Policy Act (NEPA) in deciding to replace two collapsed shelters within Olympic National Park (ONP) with new structures that were built off-site, and which would be placed in the locations of the collapsed shelters after being transported to the former sites by helicopter.

ORDER - 1

The United States of America, on behalf of the named officials of the National Park Service, cross-moves for summary judgment and opposes Plaintiff's motion for summary judgment.

**BACKGROUND**

The following summarized chronological information is taken from the parties' memoranda wherein it was designated by references to the Administrative Record (AR) in this case.

In 1938, Congress designated Olympic National Park on the Olympic peninsula. In 1974 the Wilderness Act was enacted, and NPS proposed that Congress designate the Olympic Wilderness Area (approximately 96% of the total acres) within Olympic National Park. At that time, the Park Service began internal deliberations about the appropriateness of shelters in ONP in conjunction with the Park Service's public evaluation of the eligibility of ONP lands for wilderness designation under the Wilderness Act. Also, in 1974, the Park Service prepared an Environmental Impact Statement (EIS) pursuant to the National Environmental Policy Act of 1969 (NEPA), which proposed to establish 826,139 acres of wilderness in ONP. The EIS called for the removal of a majority of shelters, but also provided for the retention of a number of shelters for health and safety purposes. Included in the list of those shelters previously and subsequently chosen for retention for health and safety purposes were Home Sweet Home and Low Divide, the shelters at issue herein. (*See* AR 5792 (ONP Shelter List, 2003).)

The 1974 EIS also determined that historic properties were not to be affected by the creation of the wilderness designation. In 1984, the Park undertook an historical structure evaluation of park properties under the National Historic Preservation Act, which determined that a number of shelters were eligible for listing in the National Register of Historic Places, and which were placed on the Park's List of Classified Structures (LCS) and set aside for historic retention. The Home Sweet Home and Low Divide shelters were not on this list as set aside for historic retention pursuant to this evaluation , citing that the structures were not yet 50 years old and that both had sustained a "considerable loss of physical integrity." (AR 444; AR 452.)

ORDER - 2

In 1988 the Olympic Wilderness was formally designated.

Although the Home Sweet Home and Low Divide shelters were not initially deemed eligible for historical retention, they were considered anew under a 1996 ONP cultural resources proposal to evaluate the park's infrastructure chronicling the park's early history.

Ultimately, on January 11, 2001, the Washington State Office of Archaeology and Historic Preservation found the two shelters to be eligible for placement in the National Historic Register following clarification that the structures were over fifty years old.  Notwithstanding the fact that the shelters had collapsed under snow loads from storms during the winter of 1998, both shelters were deemed eligible for the National Historic Register because

> [i]n spite of collapse, the shelter[s](prior to [collapse]) contributed to the important historic pattern of shelter construction and recreational use.  This location, the setting, association, and feeling are significant aspects of historic use within the park... .

(AR 416-17.)  With the shelters deemed eligible for listing as historic, the Park proposed to the State a plan to rebuild the shelters as contribution to the Park's broader efforts "to maintain the historic feeling and appearance of portions of the park trail system."  (AR 462-63.)

The two shelters were constructed in a Park maintenance yard and completed in February 2002.  The Park then considered options for replacing the shelters at their historic locations (no action, dismantling for transportation piecemeal and reassembly, reconstruction at the sites, and flying the structures intact from the maintenance yard).  (November 1, 2002, ONP Shelter Repair Environmental Assessment (EA)(AR 494-545.)   Following a public comment period and review the Park Service chose the alternative of transporting the shelters by helicopter from the Park maintenance yard to the respective historic sites with a finding that this alternative would pose no significant environmental impact (FONSI).  This alternative was selected because it preserved "important historic aspects of ONP's heritage through reconstruction of the Low Divide and Home Sweet Home trail shelters"; it "would aid in reducing risk to visitor health and safety by providing shelter in times of emergency"; it "would limit the amount of time spent reconstructing structures in

ORDER - 3

wilderness (using mechanized equipment during breeding season), and flights would occur after breeding seasons for Northern spotted owl and marbled murrelets"; and it used a combination of materials, including "reused materials from the once-standing shelters." (AR 476.)

## STANDARD OF REVIEW

Summary judgment is appropriate if there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). If the moving party shows that there are no genuine issues of material fact, the non-moving party must go beyond the pleadings and designate facts showing an issue for trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986).

Judicial review of federal agency actions under NEPA and the Wilderness Act is governed by the Administrative Procedures Act (APA), 5 U.S.C. § 701 *et seq. The Wilderness Society v. U.S. Fish & Wildlife Service*, 353 F.3d 1051, 1059 (9th Cir. 2003)(en banc)(amended 360 F.3d 1374 (9th Cir. 2004)). Under the APA, a district court may set aside an agency action only if that action is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S. C § 706(2)(A); *The Wilderness Society*, 353 F.3d at 1059. A determination of whether the agency's decision is arbitrary and capricious calls for an inquiry of "whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment. This inquiry must be searching and careful, but the ultimate standard of review is a narrow one." *Hells Canyon Alliance v. U.S. Forest Service*, 227 F.3d 1170, 1177 (9th Cir. 2000). A district court may not substitute its judgment for that of the agency, *id.*, and the court's review is limited to the administrative record at the time the agency made its decision. *Camp v. Pitts*, 411 U.S. 138, 142 (1973); *Environmental Coalition of Ojai v. Brown*, 72 F.3d 1411, 1414 (9th Cir. 1995).

ORDER - 4

# DISCUSSION

Both parties to this action acknowledge the beauty and wildness of the Olympic Wilderness Area within Olympic National Park. The value of preserving such land was recognized as early as 1897 when President Grover Cleveland set aside over two million acres of the peninsula's mountains and forests as the Olympic Forest Reserve. The Park Service recognizes that there has been an ongoing tension between people's use and enjoyment of the Park and the need to preserve the Park's wildness for future generations. In the 1930s, tourism was emphasized, and by 1933, hundreds of miles of trails and an estimated 90 trail shelters were installed. (AR 6005.) The shelters at issue in this case – Home Sweet Home and Low Divide – joined the trail system by 1935. (AR 5499, 5502.)

With the advent of the proposal to designate the Olympic Wilderness Area within the park, the NPS prepared an EIS in 1974. In the EIS, the environmental impacts associated with shelters was discussed, and, among other things it was noted:

> In recent years, with greatly expanding backcountry use, the demand for shelter use has exceeded the supply, and the impact has spread beyond and between the structures with numerous campsites and fire rings appearing, especially in the heavily used lowland valleys.

(AR 3151-52.) Both shelters at issue were located in subalpine meadow terrain. (AR 513.) The Low Divide shelter was located at Quinault Pass, between the Elwha River and North Fork Quinault River, at 3710 feet elevation. (AR 477.) The Home Sweet Home shelter was located at the headwaters of the Duckabush River, at 4198 feet elevation. (*Id.*) As stated earlier, the EIS called for the removal of the majority of shelters, but called for retention of Home Sweet Home and Low Divide for health and safety reasons. (*See* AR 5792.) In 1998, these shelters collapsed under heavy snow.

Therefore, the situation from the time of the 1974 EIS until the Olympic Wilderness was formally designated in 1988, the Home Sweet Home and Low Divide shelters were designated under the EIS for health and safety retention, but were not listed for historic retention.

ORDER - 5

When the shelters were reconsidered in 1996 for historic preservation, they meanwhile collapsed in 1998. Following the January 11, 2001 determination that Home Sweet Home and Low Divide were eligible for historic preservation, an Environmental Assessment (EA) was issued in January 2004. The EA points to the historic preservation designation for the shelters in spite of their collapse, indicates that it has already been decided that the shelters will be rebuilt (they had already been completed in February 2002), and that the EA addresses "decision of how to restore two historic shelters to their original locations," and, specifically, the proposal to airlift the two shelters from the Elwha utility yard to their original locations. (AR 497, 497A.)

The Wilderness Act of 1964 was enacted to "secure for the American people of present and future generations the benefits of an enduring resource of wilderness." P.L. 88-577, § 2(a); codified as amended at 16 U.S.C. §§ 1131-34. The Act required that wilderness areas

> shall be administered for the use and enjoyment of the American people in such manner as will leave them unimpaired for future use and enjoyment as wilderness, and so as to provide for the protection of these areas, the preservation of their wilderness character, and for the gathering and dissemination of information regarding their use and enjoyment as wilderness.

16 U.S.C. § 1131(a). "Wilderness" is defined as follows:

> A wilderness, in contrast with those areas where man and his own works dominate the landscape, is hereby recognized as an area where the earth and its community of life are untrammeled by man, where man himself is a visitor who does not remain. An area of wilderness is further defined to mean in this chapter an area of undeveloped Federal land retaining its primitive character and influence, without permanent improvements or human habitation, which is protected and managed so as to preserve its natural conditions and which (1) generally appears to have been affected by the forces of nature, with the imprint of man's work substantially unnoticeable; (2) has outstanding opportunities for solitude or a primitive and unconfined type of recreation; (3) has at least five thousand acres of land or is of sufficient size as to make practicable its preservation and use in an unimpaired condition; (4) may also contain ecological, geological, or other features of scientific, educational, scenic, or historical value.

16 U.S.C. § 1131(c). The Wilderness Act prohibits certain activities and structures, except for measures required in emergencies, in any wilderness area:

ORDER - 6

> Except as specifically provided for in this Chapter, and subject to existing private rights, there shall be no commercial enterprise and no permanent road within any wilderness area designated by this Chapter and, except as necessary to meet minimum requirements for the purpose of this Chapter (including measures required in emergencies involving the health and safety of persons within the area), there shall be no temporary road, no use of motor vehicles, motorized equipment or motorboats, no landing of aircraft, no other form of mechanical transport, and no structure or installation within any such area.

16 U.S.C. § 1133(c).

The Environmental Assessment (EA) concerning the proposal "to use a Heavy Lift Type 1 Chinook Boeing 234 Helicopter to airlift two pre-framed shelters" into the sites of the former Home Sweet Home and Low Divide shelters nevertheless recognizes that the values changed as to shelters when the Olympic National Park's Olympic Wilderness was designated:

> As part of the park wilderness planning in the 1970's, these shelters [Home Sweet Home and Low Divide] were determined necessary for visitor health and safety.  In 1988, Congress designated over 95% of the park as wilderness.  The Wilderness Act and current NPS Management Policies encourage wilderness users to prepare for, and encounter the wilderness on its own terms, striving to provide "primitive and unconfined" recreation opportunities, complete with the risks that arise from wildlife, weather conditions, etc. **NPS wilderness management policies do not support the provision of facilities in wilderness specifically to eliminate these risks.**

(AR 497, emphasis added.)  In spite of recognizing the shift in values upon the designation of the Olympic Wilderness, because the two structures had been determined eligible for the National register of Historic Places in 1998, even though a combination of deferred maintenance on these structures and heavy snow (greater than 18 feet) in 1998-99 led to their destruction, the decision was made to reconstruct them.  (AR 497.)  Thus, the National Park Service concluded in the EA, which was prepared to satisfy the requirements of the National Environmental Policy Act (NEPA, 1969 as amended), that airlifting the structures into the Wilderness was the best choice:

ORDER - 7

> The alternative chosen would further the management decision of ONP to maintain and protect certain shelters in ONP's wilderness for the purposes of cultural resource protection.

(AR 497A.)

This decision of the National Park Service to airlift the reconstructed shelters into the Olympic Wilderness brings the values of historic preservation and wilderness preservation into conflict with each other. How to resolve the conflict between these two concepts is the issue presented in this case.

There is no specific provision for maintaining and/or replacing shelters within the Olympic Wilderness; the law creating the Olympic Wilderness Area specifically allowed the National Park Service to "upgrade maintain and replace" only one structure – an underground powerline – as long as the maintenance and operation was "consistent with wilderness management." P.L. 100-688, § 102, 102 Stat. 3961 (November 16, 1988).

The emergency exception of Section 16 U.S.C. § 1133(c) of the Wilderness Act referenced earlier herein (16 U.S.C. § 1133(c) "... measures required in emergencies involving the health and safety of persons within the area")  most logically refers to matters of urgent necessity rather than to conveniences for use in an emergency. As the National Park Service itself has recognized in the context of the EA for the proposal to airlift the structures into the wilderness:

> The Wilderness Act and current NPS Management Policies encourage wilderness users to prepare for, and **encounter the wilderness on its own terms**, striving to provide "primitive and unconfined" recreation opportunities, **complete with the risks that arise from wildlife, weather conditions, etc. NPS wilderness management policies do not support the provision of facilities in wilderness specifically to eliminate these risks.**

(AR 497, emphasis added.)   Moreover, the definition of "wilderness" is an area "retaining its primitive character and influence, without permanent improvements or human habitation." 16 U.S.C. § 1131(c). The emergency exception cannot support the insertion of the shelters into the Olympic Wilderness.

ORDER - 8

1    Of course, here, the National Park Service is proceeding on Olympic National Park's decision
2    to reconstruct the Home Sweet Home and Low Divide shelters for replacement in the Olympic
3    Wilderness "for the purposes of cultural resource protection." (AR 497A (EA).) The National
4    Historic Preservation Act's (NHPA) effect in the context of the Wilderness Act was addressed in
5    *Wilderness Watch and Public Employees for Environmental Responsibility v. Mainella*, 375 F.3d
6    1085 (11th Cir. 2004):

> As an initial matter, **we cannot agree with the Park Service that the preservation of historical structures furthers the goals of the Wilderness Act.** The Park Service's responsibilities for the historic preservation of Plum Orchard and the settlement derive, not from the Wilderness Act, but rather from the National Historic Preservation Act. (NHPA), 16 U.S.C. § 461, et seq. The NHPA requires agencies to "assume responsibility for the preservation of historic properties" they control.
>
> ***
>
> The agency's obligations under the Wilderness Act are quite different. The Wilderness Act defines wilderness as "undeveloped Federal land retaining its primeval character and influence, without permanent improvements or human habitation." 16 U.S.C. § 1131(c) A wilderness area should "generally appear[ ] to have been affected primarily by the forces of nature, with the imprint of man's work substantially unnoticeable." *Id.* Another section of the Act explicitly states that, except as necessary for minimal administrative needs that require occasional vehicle use,"there shall be ... no structure or installation within any such [wilderness] area." 16 U.S.C. § 1133(c). As the Park Service notes, Section 1133(b) mentions "historical use" along with "recreational, scenic, scientific, educational, [and] conservation" uses. However, this list tracks the definition of wilderness areas in § 1131(c), which describes"a primitive and unconfined type of recreation" and "ecological, geological, or other features of scientific, educational, scenic, or historical value." 16 U.S.C. § 1131(c). **Given the consistent evocation of "untrammeled" and "natural" areas, the previous pairing of "historical" with "ecological" and "geological" features, and the explicit prohibition on structures, the only reasonable reading of "historical use" in the Wilderness Act refers to natural, rather than man-made features.**

375 F.3d 1085, 1091-92, emphasis added. The Court's reasoning in *Wilderness Watch v. Mainella* is persuasive. While the former structures may have been found to have met the requirements for historic preservation, that conclusion is one that is applied to a man-made shelter in the context of the history of their original construction and use in the Olympic National Park. Once the Olympic Wilderness was designated, a different perspective on the land is required. Regarding the Olympic Wilderness, that perspective means **"**land retaining its primitive character and influence, without

ORDER - 9

permanent improvements or human habitation, which is protected and managed so as to preserve its natural conditions." 16 U.S.C. § 1131(c).  If under NPS wilderness management policies wilderness users are to be encouraged "to prepare for, and encounter the wilderness on its own terms, complete with the risks that arise from wildlife, weather conditions, etc." (AR 497), for a wilderness user to come across a brand new structure in a subalpine meadow would surely be disconcerting and obviously detract from  experiencing, in the Park Service's words, "wilderness on its own terms" (AR 497) in a land of "primeval character and influence, without permanent improvements or human habitation." 16 U.S.C. § 1131(c).  Also, as noted in the 1974 EIS, the shelters contribute their own impacts when visitors repeatedly seek them out.  (AR 3151-52.)  If the reconstructed shelters were placed in the Olympic Wilderness, regardless of whether they were placed in the locations of the former shelters, the National Park Service would not be administering the area in accordance with its mandate under the Wilderness Act:

> [E]ach agency administering any area designated as wilderness shall be responsible for preserving the wilderness character of the area and **shall so administer such area for such other purposes for which it may have been established as also to preserve its wilderness character.**

16 U.S.C. § 1133(b)(emphasis added).

Furthermore, the NHPA's goal of preserving historic structures allows for "rehabilitation, restoration, stabilization, maintenance," (16 U.S.C. § 470w(8)), among other things, but it does not require reconstruction.   Thus, where the former shelters at issue here have been destroyed by natural forces, NHPA does not require reconstruction.  In *National Trust for Historic Preservation v. Blanck*, 938 F. Supp. 908, 922 (D. D.C. 1996) *affirmed*, 203 F.3d 53 (D.C. Cir. 1999), at issue was the Army's permitting the decay and deterioration of historic buildings in the National Park Seminary Historic District at the Walter Reed Army Medical Center.  The Plaintiffs urged an interpretation of Section 110 of the NHPA to create an independent, substantive requirement that agencies engage in minimal preservationist activities so long as such activities are consistent with the

ORDER - 10

agency's mission.  The Court rejected that interpretation concluding that "Section 110(a) cannot be read to create new substantive preservationist obligations separate and apart from the overwhelmingly procedural thrust of the NHPA as described by every court that has considered the Act."  *Id.* 922.   *U.S. v. 162.20 Acres of Land, More or Less,* 639 F.2d 299 (5th Cir. 1981) earlier reached a consistent conclusion:

> Section 470(f) of the [NHPA] creates a mechanism to promote [historic and cultural] values neither by forbidding the destruction of historic sites nor by commanding their preservation, but instead by ordering the government to take into account the effect any federal undertaking might have on them.

*Id.* at 302.

The National Park Service argues that the Historic Sites Act of 1935 at section 462(f) "requir[es] NPS to restore, reconstruct, rehabilitate, preserve and maintain *historic property*," (emphasis in original), but Section 466(a) of that Act provides that no funds may be expended for the purposes of Section 462(f) unless and until Congress specifically authorizes such an appropriation.  There is no assertion that Congress has authorized the appropriation of funds to NPS to build the new shelters at issue here and to place them in the Olympic Wilderness.

The National Park Service points to the Organic Act of 1916 as requiring it "to conserve *historic objects*," citing 16 U.S.C. § 1, where there is a general description of why Congress created the National Park System:  "to conserve the scenery and the natural and historic objects and the wild life therein ...."  *Id.*  Even so, the NPS also interprets the Wilderness Act to require greater protection than the Organic Act would require.  "The effect of the Wilderness Act is to unambiguously place an additional layer of protection on wilderness areas within the National Park System."  (AR 3014 (NPS Reference Manual 41 at p. 8).)  The Organic Act cannot be interpreted to require replacement of collapsed shelters with new reconstructions to be placed in the wilderness by helicopter where the Wilderness Act is a specific, protective statute militating against such intrusions.

ORDER - 11

The Wilderness Act provides that an agency utilizing its authority under other laws in ways that affect the wilderness must do so pursuant to the requirements of the Wilderness Act as a whole:

> Except as otherwise provided in this chapter, each agency administering any area designated as wilderness shall be responsible for preserving the wilderness character of the area and shall so administer such area for such other purposes for which it may have been established as also to preserve its wilderness character.

16 U.S.C. § 1133(b).  A long established rule of statutory construction is that where there is a specific provision that governs an issue, it takes superiority over any general provision.  Here, the Wilderness Act under which the Olympic Wilderness was designated, is the specific provision, while the National Historic Preservation Act, among others earlier mentioned, is the general.  This rule allows the NPS to administer the Olympic Wilderness for other purposes only insofar as to also preserve its wilderness character.

## CONCLUSION

The National Park Service has not considered its shelter replacement proposal giving proper deference to the mandates of the Wilderness Act.  A determination of whether the agency's decision is arbitrary and capricious calls for an inquiry of "whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment."  *Hells Canyon Alliance v. U.S. Forest Service*, 227 F.3d 1170, 1177 (9th Cir. 2000).  There has been a clear error of judgment in this case because although the NPS, *arguendo*, may have proceeded appropriately under the operative historic preservation laws to determine whether the shelters were historic, the subsequent decision concerning whether to place reconstructed shelters in the former locations of Home Sweet Home and Low Divide failed to properly reconcile doing so with the mandate to preserve the wild and primitive character of the Olympic Wilderness.  The Home Sweet Home and Low Divide shelters have collapsed under the natural effects of weather and time, and to reconstruct the shelters and place the replicas on the sites of the original shelters by means of a helicopter is in direct contradiction of the mandate to preserve the wilderness character of the Olympic Wilderness.

ORDER - 12

The Park Service references the historic pattern of shelter construction and recreational use in concluding that the "setting, association, and feeling are significant aspects of historic use within the park" (AR 416-17), but while this may be true, this type of usage is in the past and a new value has been placed on the land by the creation of the Olympic Wilderness.  Rather than emphasizing tourism and providing hundreds of miles of trails and approximately 90 shelters, a different "feeling" of wilderness is sought to be preserved for future generations to enjoy, a place "where the earth and its community of life are untrammeled by man" and which retains "its primitive character and influence, without permanent improvements." 16 U.S.C. § 1131(c).  The Park Service need not build replica shelters to be airlifted into locations where the original shelters once stood in order to preserve history.  It is apparent from the record that photographs and other chronicles document the history of the usage of Olympic National Park before the Olympic Wilderness was designated.

NOW, THEREFORE, IT IS ORDERED:

1. Plaintiffs' Motion for Summary Judgment [Dkt. # 16] is GRANTED;

2. Defendants' Motion for Summary Judgment [Dkt. # 18] is DENIED;

3. This cause of action is DISMISSED and the Clerk of the Court is directed to enter judgment for Plaintiffs.

DATED this 29th day of July 2005.

FRANKLIN D. BURGESS
UNITED STATES DISTRICT JUDGE

ORDER - 13